1  BRIAN J. STRETCH (CABN 163973)
   Acting United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  AMBER ROSEN (CABN 160380)
   Assistant United States Attorney
5
        150 Almaden Boulevard, Suite 900
6       San Jose, California 95113
        Telephone: (408) 535-5061
7       FAX: (408) 535-5066
        Amber.rosen@usdoj.gov
8
   Attorneys for United States of America
9

*FILED*

*JAN 2 9 2016*

*CLERK, SUSAN Y. SOONG*
*NORTHERN U.S. DISTRICT COURT*
*DISTRICT OF COURT*
*SAN JOSE, CALIFORNIA*

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13  IN RE:                          )  CASE NO.  CR 15-90921 MISC PSG
                                    )
14  DISCLOSURE OF TAXPAYER RETURNS  )  UNSEALED REDACTED VERSION OF EX
    AND RETURN INFORMATION          )  PARTE APPLICATION AND DECLARATION
15                                  )  FOR DISCLOSURE OF TAX RETURN AND
                                    )  RETURN INFORMATION AND COURT'S
16                                  )  ORDERING GRANTING APPLICATION
                                    )
17                                  )
                                    )
18  _____ )

19

20        The United States of America hereby files an unsealed, redacted version of its earlier-filed ex

21  parte application and declaration for disclosure of tax return and return information and the Court's

22  order granting the application, both of which are attached hereto.

23  DATED: January 28, 2016              Respectfully submitted,
                                         BRIAN J. STRETCH
24                                       Acting United States Attorney

25

26                                       _____
                                         AMBER ROSEN
27                                       Assistant United States Attorney

28                                              1

REDACTED VERSION OF TAX APPLICATION
CR 15-90921 MISC PSG

To: file pursuant to order with docket #3

1 | BRIAN J. STRETCH (CABN 163973)  SEALED BY ORDER
Acting United States Attorney  OF THE COURT

2

3 | DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

4 | AMBER ROSEN (CABN 160380)
Assistant United States Attorney

5

6 | 150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5061

7 | FAX: (408) 535-5066
Amber.rosen@usdoj.gov

8

9 | Attorneys for United States of America

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 | SAN JOSE DIVISION

13 | IN RE:   CR 15 90921 MISC   PSG

14 | DISCLOSURE OF TAXPAYER RETURNS )   EX PARTE APPLICATION AND DECLARATION
AND RETURN INFORMATION )   FOR DISCLOSURE OF TAX RETURN AND

15 |   )   RETURN INFORMATION AND MOTION TO
  )   SEAL

16 |   )
  )   (UNDER SEAL)

17 |   )

18 |   )

19 | The United States of America, by and through its attorneys, Brian J. Stretch, Acting United

20 | States Attorney for the Northern District of California, and Amber Rosen, Assistant United States

21 | Attorney, hereby moves the Court, pursuant to 26 U.S.C. §§ 6103(i)(1)(A)(ii) and (iii); and 4(A)(i), for

22 | an ex parte order authorizing the disclosure of the 2009-2015 returns, return information, and other

23 | information concerning:

24 | 1.   LAURENCE MILES

25

26 | 2.   THE MILES TRUST or LAURENCE MILES TRUST

27 | 3.   ROBERT STEPHENS

28

2
EX PARTE APPLICATION FOR TAX INFORMATION

1             4.      MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI)

2

3             5.      RAYAN LAKSHMANAN

4             6.      SHIRLEY MOLINA (a.k.a. SHIRLEY JACKSON, a.k.a. SHIRLEY
5                     KERKORIAN, a.k.a. SHIRLEY GREGORIAN, a.k.a. SHIRLEY
                  JOCOBO)

6

7   A.      STATUTORY AUTHORITY

8         1.      Generally, income tax returns cannot be disclosed by the Internal Revenue Service.  26

9   U.S.C. § 6103(a).  An exception to this general rule, however, is provided by 26 U.S.C. § 6103(i), which

10   authorizes a court to order disclosure in connection with the administration of federal laws not relating

11   to tax administration.

12         2.      Section 6103(i)(1) provides:
          (1)      Disclosure of returns and return information for use in criminal
13            investigations. --

14             (A)      In general. -- Except as provided in paragraph (6),
     [Paragraph 6 provides an exception to disclosure if the Secretary of the
15        Treasury determines "that such disclosure would identify a confidential
     informant or seriously impair a civil or criminal tax investigation."] any
16        return or return information with respect to any specified taxable period or
     periods shall, pursuant to and upon the grant of an ex parte order by a
17        Federal district court judge or magistrate under subparagraph (B), be open
     (but only to the extent necessary as provided in such order) to inspection
18        by, or disclosure to, officers and employees of any Federal agency who are
     personally and directly engaged in --

19              (i)      preparation for any judicial or administrative proceeding
20        pertaining to the enforcement of a specifically designated criminal statute
     (not involving tax administration) to which the United States or such
21        agency is or may be a party,

22              (ii)      any investigation which may result in such a proceeding, or

23              (iii)      any Federal grand jury proceeding pertaining to the
     enforcement of such a criminal statute to which the United States or such
24        agency is or may be a party,

25      solely for the use of such officers and employees in such preparation,
   investigation, or grand jury proceeding.

26             (B)      Application for order. -- The Attorney General . . . [or] any
   United States Attorney . . . may authorize an application to a Federal
27      district court judge or magistrate for the order referred to in subparagraph
   (A).  Upon such application, such judge or magistrate may grant such

28

3

EX PARTE APPLICATION FOR TAX INFORMATION

order if he determines on the basis of facts submitted by the applicant that --

> (i)     there is reasonable cause to believe, based upon such information believed to be reliable, that a specific criminal act has been committed,

> (ii)    there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission of such act, and

> (iii)   the return or return information is sought exclusively for use in a Federal criminal investigation or proceeding concerning such act, and the information sought to be disclosed cannot reasonably be obtained, under the circumstances, from another source.

3.     Section 6103(i) also provides for the disclosure and use of returns and return information in administrative and judicial forfeiture proceedings related to criminal and forfeiture statutes:

> (4)(A)  Returns and taxpayer return information.-- Except as provided in subparagraph (C), any return or taxpayer return information obtained under paragraph (1) may be disclosed in any judicial or administrative proceeding pertaining to enforcement of a specifically designated Federal criminal statute or related civil forfeiture (not involving tax administration) to which the United States or a Federal agency is a party

>> (i) if the court finds that such return or taxpayer return information is probative of a matter in issue relevant in establishing the commission of a crime or the guilt or liability of a party, or
>> (ii) to the extent required by order of the court pursuant to section 3500 of Title 18, United States Code, or Rule 16 of the Federal Rules of Criminal Procedure.

4.     The statute defines returns and return information to include, among other things, any tax or information returns, including supporting schedules and attachments; a taxpayer's identity; the nature, source, or amount of the taxpayer's income, payments, and adjustments; whether the taxpayer's return was, is being, or will be examined or subject to other investigation; any other data in the possession of the Secretary of the Treasury relating to a return or to the determination of the existence, or possible existence, of liability of any person for any tax, penalty, or interest; any part of any written determination or any background file document relating to such written determination that is not open to public inspection.  See 26 U.S.C. § 6103(b).

B.     BASIS FOR REQUEST

As demonstrated by the facts set forth more fully in the declaration of Federal Bureau of

4

EX PARTE APPLICATION FOR TAX INFORMATION

1 Investigation (FBI) Special Agent Matthew Accardo, which is attached to and is part of this application:

2       1.      The FBI is currently engaged in the continuing investigation of LAURENCE MILES,

3 MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI), ROBERT STEPHENS, RAYAN LAKSHMANAN, and

4 SHIRLEY MOLINA (the "SUBJECTS").

5       2.      Based upon information believed to be reliable, there is reasonable cause to believe that

6 the SUBJECTS have committed criminal acts, in particular, wire fraud, in violation of Title 18, United

7 States Code, Section 1343.

8       3.      The returns, return information, and other information sought by this application are or

9 may be relevant to the commission of the specified criminal acts because we believe, based on the

10 review of other documents, witness interviews, and other information obtained through the

11 investigation, that the tax records sought are relevant to determine the source of any income and to

12 identify assets and bank accounts belonging to the SUBJECTS.

13       4.      The government is seeking these returns, return information, and other information

14 exclusively for use in this federal criminal prosecution and continuing investigation and grand jury

15 proceeding. These documents cannot reasonably be obtained, under the circumstances, from another

16 source. Any disclosed returns, return information, and other information will be disclosed only to the

17 United States Attorney, Assistant United States Attorney Amber S. Rosen, and any other persons only in

18 accordance with the provisions of 26 U.S.C. § 6103 and 26 C.F.R. § 301.6103(i)-1.

19       5.      As required by statute, the United States Attorney has authorized this application.

20       THEREFORE, the government respectfully requests this Court issue an order:

21       (1)      Authorizing the disclosure of the returns and return information as those terms are

22 defined in 26 U.S.C. § 6103(b), and other information, to the United States Attorney, Assistant United

23 States Attorney Amber S. Rosen, and any other persons only in accordance with the provisions of 26

24 U.S.C. § 6103 and 26 C.F.R. § 301.6103(i)-1, including, but not limited to, any tax or information

25 returns including supporting schedules, attachments, or lists; any documents identifying the nature,

26 source, or amount of the taxpayer's income, receipts, assets, and liabilities, including CMIRs and Forms

27 8300; documents related to any examination, investigation or processing of the taxpayer's return; any

28 documents reflecting a determination of liability of any person or any background file documents

5

EX PARTE APPLICATION FOR TAX INFORMATION

1  relating to such written determination; any documents collected or voluntarily provided to the IRS from

2  sources other than the taxpayer; and certificates of non-filing if returns or return information have not

3  been filed, for the years 2009-2015 for:

4       1.     LAURENCE MILES

5

6       2.     THE MILES TRUST or LAURENCE MILES TRUST

7       3.     ROBERT STEPHENS

8       4.     MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI)

9

10      5.     RAYAN LAKSHMANAN

11      6.     SHIRLEY MOLINA (a.k.a. SHIRLEY JACKSON, a.k.a. SHIRLEY

12              KERKORIAN, a.k.a. SHIRLEY GREGORIAN, a.k.a. SHIRLEY
                JOCOBO);

13 2)     Directing that this Application, including the Declaration, and the Order issued pursuant hereto

14 be placed under seal by the Clerk of Court until further order of this Court, except that copies of the

15 Order issued pursuant to this Application may be provided to the authorized representatives of the

16 United States Attorney's Office and served upon the Internal Revenue Service. The basis for sealing the

17 Application, Declaration, and Order are that the SUBJECTS have not been arrested or indicted and are

18 under continuing investigation. While the targets are aware that the FBI is looking into the scheme,

19 should they become aware of the scope of the investigation, including which witnesses have provided

20 what information, it could result in the intimidation of witnesses, the destruction of evidence, or the

21 flight of the SUBJECTS, particularly the flight of MILES, as he is a citizen of the United Kingdom.

22 DATED: October 19, 2015           Respectfully submitted,

23

24                     BRIAN J. STRETCH

25                     Acting United States Attorney
                       Northern District of California

26

27

28

6

DECLARATION IN SUPPORT OF APPLICATION FOR TAX RETURN INFORMATION

I, Matthew Accardo, hereby declare under penalty of perjury as follows:

1.      I am a special agent of the Federal Bureau of Investigation (FBI), and have been since July 2013. As such, pursuant to the authority granted to the Attorney General by Public Law 99-570, Section 1869, and delegated by Title 28, Code of Federal Regulations, Subpart R, Section 0.100 et. seq., I am authorized to exercise the powers of law enforcement personnel set forth in Title 21, United States Code, Section 878. Those powers are to: 1) carry firearms; 2) execute and serve search warrants, arrest warrants, administrative inspection warrants, subpoenas, and summonses issued under the authority of the United States; 3) make arrests without a warrant (A) for any offense against the United States committed in my presence, or (B) for any felony, cognizable under the laws of the United States, if I have probable cause to believe that the person to be arrested has committed or is committing a felony; 4) make seizures of property pursuant to the provisions of 21 U.S.C. §§ 801-904; and 5) perform such other law enforcement duties as the Attorney General may designate.

2.      I am currently assisting other special agents from the FBI and the Internal Revenue Service, Criminal Investigation (IRS-CI) in the investigation of LAURENCE MILES, MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI), ROBERT STEPHENS, RAYAN LAKSHMANAN, and SHIRLEY MOLINA (hereinafter "the SUBJECTS") for wire fraud, in violation of 18 U.S.C. § 1343.

3.      I make this affidavit based upon my personal knowledge, experience, and investigation in this matter, written and oral information I have received from my colleagues, my review and examination of evidence obtained from witnesses, and discussions with other investigating law enforcement officers. I have not attempted to include in this affidavit all the evidence collected during this investigation.

4.      It is believed that the tax information of the SUBJECTS for the years 2009 through 2015 may be relevant to the SUBJECTS' misappropriation of funds. What the SUBJECTS report on their individual tax returns may reveal whether they had any legitimate income during these years that could be an alternative source for the funds they appear to have solicited. Tax returns or other tax information

7

1   could also reveal additional assets or bank accounts that could help identify the receipt or use of

2   fraudulently obtained funds. If no returns were filed, the lack of filing may be relevant to corroborating

3   that any money the SUBJECTS had during these years was derived from illegitimate sources.

4                                    Summary of the Scheme to Defraud

5          5.       In August 2014, the FBI initiated an investigation into an investment fraud scheme

6   involving the SUBJECTS.  This investigation has been conducted jointly with the IRS-CI and currently

7   continues.  The investigation has shown that the SUBJECTS have been involved in a scheme to solicit

8   funds from investors, making representations that the money is being used for a terminally ill elderly

9   woman's medical expenses.  The SUBJECTS have told investors that this woman, whom they often

10  refer to as "SHIRLEY" or "S," is heir to a large estate stalled in probate court by the Federal Reserve

11  Bank and other government agency bureaucratic red tape.  At various times, the SUBJECTS have

12  claimed the estate is worth one billion dollars, 500 billion dollars, and one trillion dollars.  The

13  SUBJECTS claim that SHIRLEY was adopted into the family of billionaire Kirk Kerkorian.  In

14  exchange for contributions toward SHIRLEY's medical expenses (often consisting of blood transfers or

15  transfusions), investors are promised large returns—as much as one million dollars for every one

16  thousand dollars invested—when the estate is disbursed.  The SUBJECTS have told investors that

17  SHIRLEY's full identity, information regarding the probate proceedings, and all associated details are

18  under a strict gag order originally imposed in a San Francisco court by Judge John Dearman, the judge

19  they claim initially presided over the case.  Accordingly, most investors receive very few details or

20  documented information other than periodic updates from MILES, SHIRAZI, STEPHENS, and/or

21  LAKSHMANAN.  Over the last several years, this scheme has successfully solicited millions of dollars

22  from dozens of investors, and investors are continually told that the disbursement of the estate is

23  imminent. None have received any money from their investment.

24         6.       In the course of this investigation, SHIRLEY MOLINA (hereinafter "SHIRLEY") was

25  located and interviewed by telephone.  Though SHIRLEY admitted to knowing Miles, to having created

26  a false story regarding her past that largely mirrors the story that MILES, SHIRAZI, STEPHENS, and

27  LAKSHMANAN have told investors, and to being previously convicted of a fraud scheme similar to the

28  one here, she denies any involvement in the current scheme.  Witnesses, however, have indicated that

                                                        8

EX PARTE APPLICATION FOR TAX INFORMATION

1   SHIRLEY is currently receiving money from MILES.

2        7.     Through investigation and interviews with persons including Judge Dearman, a

3   representative of Kirk Kerkorian, and a representative of the Federal Reserve Bank in San Francisco,

4   investigating agents have determined that the estate the SUBJECTS have described to investors does not

5   exist.

6   Solicitation of Funds

7        8.     In August of 2014, a Confidential Human Source (hereinafter "CHS") told agents that

8   CHS wire transferred approximately $200,000 total to the bank accounts of STEPHENS and MILES

9   between October 9, 2009 and February 5, 2013 (approximately $70,000 of this amount was not

10  transferred via wire).  CHS intended the funds for SHIRLEY's medical expenses.  According to CHS,

11  and corroborated by e-mails and text messages CHS provided to agents, STEPHENS told CHS that the

12  return on the investment would be $106 million upon distribution of the trust.  CHS said that

13  STEPHENS was the primary person who solicited CHS to invest.  STEPHENS told CHS that MILES is

14  the Trustee over the probate matter and that SHIRAZI is the Trustee's assistant (both referred to as

15  "principals").  According to STEPHENS, MILES dealt directly with SHIRLEY, Judge John Dearman

16  (the San Francisco probate judge) and officials from the Federal Reserve Bank.  Specifically, MILES

17  dealt extensively with a forensic accountant, known as "Richard," representing the Federal Reserve

18  Bank of San Francisco.

19       9.     On September 25, 2014, CHS made a consensually monitored and recorded telephone

20  call from an FBI Office to STEPHENS.  During the recorded call, CHS explained to STEPHENS that

21  CHS could possibly find another investor if it would help release disbursements sooner, but that the new

22  investor would insist on meeting MILES face-to-face because MILES was the Trustee.  STEPHENS

23  confirmed that MILES, who resided in Los Angeles, would be very interested in another investor and

24  was in the process of preparing a prospectus that could be provided to the potential investor.

25  STEPHENS said MILES would be willing to travel to San Jose to meet with the potential investor and

26  would show the new investor a prospectus and other documentation in person.  MILES said he did not

27  want anyone to have copies or a screenshot of the material because it could potentially violate the gag

28

9

1    order.

2        10.    On October 23, 2014, CHS introduced an FBI undercover special agent (hereinafter

3    "UCA") to STEPHENS during a recorded meeting in San Jose, California. The UCA posed as a

4    wealthy potential investor seeking more information about the terms of the investment. Although

5    MILES and SHIRAZI did not show up to this meeting, STEPHENS acted as their representative and

6    provided specific details to the UCA about SHIRLEY's medical needs, her estate (stating it was valued

7    at one-half trillion dollars), and the on-going probate proceedings with the Federal Reserve Bank.

8    STEPHENS further stated that he talks to MILES everyday regarding updates about the investment,

9    SHIRLEY's progress, the progress with the Federal Reserve Bank, and interactions with the presiding

10   probate judge. STEPHENS stated to the UCA that MILES has a partner (referring to SHIRAZI) in Los

11   Angeles "helping him." STEPHENS introduced LAKSHMANAN as an "advisor" and a former

12   "Goldman Sachs guy" with many years of experience in investment banking. STEPHENS also

13   confirmed CHS's statement to investigators that every one thousand dollars invested would yield a one

14   million dollar return. STEPHENS ultimately solicited an initial $30,000 investment from the UCA. The

15   UCA stated that he would consider the investment upon personally meeting with MILES and SHIRAZI.

16   STEPHENS agreed to make the meeting happen.

17       11.    Over the next few days, STEPHENS made arrangements for a face-to-face meeting

18   involving all parties in San Jose, California. On October 30, 2014, during a recorded meeting, the UCA

19   met with STEPHENS, MILES, SHIRAZI, and LAKSHMANAN in San Jose, California, to discuss the

20   investment. MILES claimed that SHIRLEY's estate was actually worth one trillion dollars.

21   STEPHENS said there was a new judge in the case (replacing Judge Dearman), and she was ready to

22   "green light the transfer." STEPHENS and LAKSHMANAN made statements indicating that

23   disbursements may even be tax-exempt. When discussing the return on the investment, STEPHENS

24   stated to the group, "I have offered John [UCA] what I have typically offered . . . . $1 million per

25   thousand." STEPHENS also claimed that the IRS gets paid an estate tax every 60 days by the Trustee

26   (MILES) and that the IRS may actually owe the estate money when "this thing is done." SHIRAZI and

27   MILES both made statements asserting their connection to and interaction with SHIRLEY, the

28   billion/trillion dollar estate, the Federal Reserve Bank of San Francisco, and the general probate process.

EX PARTE APPLICATION FOR TAX INFORMATION

1  When asked about legality, STEPHENS stated "everything is above board."

2        12.     Based in part on the meeting the UCA had with MILES, STEPHENS, LAKSHMANAN,

3  and SHIRAZI it appears that LAKSHMANAN is STEPHENS' assistant and generates most of the

4  investment related paperwork. CHS also stated that LAKSHMANAN stated that LAKSHMANAN

5  generates most of the investment-related documents provided to investors. LAKSHMANAN either e-

6  mails documents to investors on STEPHENS' behalf or provides them in person. LAKSHMANAN was

7  also present during both meetings with the UCA and supported STEPHENS regarding the validity of the

8  investment. In order to bring an air of legitimacy to this investment, LAKSHMANAN has stated to

9  investors, including the UCA, that he is a former six-year employee of Goldman Sachs, in New York,

10  New York. CHS also told investigators that LAKSHMANAN is a "former Goldman Sachs financial

11  guy." On December 9, 2014, in response to a Federal Grand Jury Subpoena, Goldman Sachs provided

12  employment records to the FBI that indicate LAKSHMANAN was only a summer intern during the

13  summer of 1998.

14        13.     On May 28, 2015, agents interviewed Constance Cummings, another investor in the

15  scheme. Cummings met STEPHENS in January 2012 through a mutual friend, and they all spoke about

16  the SHIRLEY investment. STEPHENS told Cummings that SHIRLEY was born in post-war Germany.

17  SHIRLEY was the daughter of a Black G.I. and a young German girl. SHIRLEY was given up for

18  adoption and grew up in an orphanage. SHIRLEY was selling vegetables by the roadside of a vegetable

19  patch when she was spotted by a rich American who eventually adopted her and brought her to the

20  United States. This rich American was the brother of billionaire Kirk Kerkorian. SHIRLEY has sickle

21  cell and mercury poisoning. SHIRLEY's dad was killed and left a huge inheritance for SHIRLEY that

22  was tied up in escrow due to bad lawyers. Currently the estate is held in trust by a lawyer and is worth a

23  trillion dollars. SHIRLEY needs money for blood "transfers" to keep her alive due to her medical

24  ailments. Those who contribute to the fund to help SHIRLEY with her medical expenses will be repaid

25  substantially in return. Cummings understood from STEPHENS that the estate was worth one trillion

26  dollars.

27        14.     STEPHENS introduced Cummings to MILES and SHIRAZI in Los Angeles in early

28  2012. MILES and SHIRAZI reiterated the same story regarding SHIRLEY and the investment

11

EX PARTE APPLICATION FOR TAX INFORMATION

1  opportunity that STEPHENS told to Cummings.

2      15.   Eventually, Cummings invested in the trust. After investing money, sometime in 2012,
3  Cummings insisted on talking to SHIRLEY. The next day MILES set it up. Cummings talked to
4  someone on the telephone who identified herself as "SHIRLEY." The woman on the telephone wanted
5  Cummings to know that she (SHIRLEY) owed her life to MILES.

6      16.   Cummings understood that a very small portion of the investment money would go to
7  some personal expenses for MILES, as well as bodyguards for SHIRLEY, and "other things that Judge
8  Dearman wanted." However, Cummings' impression was that the ratio of medical expenses versus
9  personal expenses was around 90/10.

10     17.   Cummings had direct access to MILES and SHIRAZI and did not have to go through
11  STEPHENS to speak to them. Cummings still remained in routine contact with STEPHENS and
12  received periodic text updates from STEPHENS. Cummings stated that, according to STEPHENS,
13  STEPHENS typically got his information regarding the updates from SHIRAZI (who, in turn, received
14  his information from MILES).

15     18.   Ultimately, Cummings estimated her total investment in the trust to be approximately $3
16  million. Her promised return was $4.5 billion. A review by IRS-CI Special Agent (SA) Eric Richards
17  of bank records of accounts held by STEPHENS, MILES, and SHIRAZI corroborates that they have
18  received more than $3 million from Cummings between 2012 and the present.

19     19.   The agents have spoken to approximately nine other investors. Nearly each one of these
20  investors tells of being recruited to invest, either by one of the SUBJECTS or by a friend, with a similar
21  story about helping to fund the medical expenses of "SHIRLEY," and in exchange receiving a large
22  return once the estate is out of probate. Although the amounts of promised returns have varied, it is
23  always a very large return, often along the order of $1,000 for every one dollar invested. A small
24  number of investors have been promised the return of their principle invested, plus interest. Each also
25  states that they receive periodic updates, generally from one of the subjects or from a friend who
26  received it from one of the subjects, in which they are told that the payout is imminent. Explanations for
27  the delay are generally described as related to the Federal Reserve, the judge's conduct, or other "red
28  tape." Most of the interviewed investors have also explained that they are subject to a gag order which

EX PARTE APPLICATION FOR TAX INFORMATION

1    prevents them from obtaining additional information.

2        Financial Records Demonstrate that a Large Portion of Investor Funds Go to the Subjects

3        20.     An examination by IRS-CI SA Eric Richards of bank records show that between 2009

4 and 2015, the interviewed investors have deposited over $4 million into accounts controlled by either

5 STEPHENS, MILES, or SHIRAZI, including accounts at Wells Fargo Bank for the LAURENCE

6 MILES TRUST, at JP Morgan Chase Bank and Citibank for SHIRAZI, and at Umpqua Bank for

7 STEPHENS. During this same timeframe, these accounts show deposits from other individuals totaling

8 approximately one-million dollars and cash deposits totaling approximately $500,000. Investigation has

9 revealed no other source of regular deposits for either STEPHENS or MILES. SHIRAZI's accounts

10 have also received deposits from an energy company. Given the pattern and amount of the deposits

11 from these other individuals, along with information contained in e-mails obtained through search

12 warrants (including investor lists and e-mail "updates" regarding SHIRLEY and the estate) it is believed

13 that the additional individual depositors are also investors in the scheme, such that the total amount of

14 funds solicited and received is over $5 million.

15        21.     IRS-CI SA Richards analyzed the LAURENCE MILES TRUST accounts held by MILES

16 at Wells Fargo Bank. MILES had eight trust accounts there. Only Trust Account One received

17 investors' funds, and the other seven had minimal balances. Trust Account One received in excess of $4

18 million dollars between 2010 and 2014, almost all of which was funds from individual investors and

19 most of which came from one investor. Wells Fargo Bank closed the trust accounts in July 2014.

20 Analysis of Trust Account One reveals that approximately 65% of the funds were withdrawn in cash and

21 cannot be traced, almost 20% went to SHIRAZI, 6% to MILES or his family members, 3% in small

22 transactions to various businesses, and the remainder was transferred to other bank accounts. No monies

23 can be traced going to pay for SHIRLEY's medical expenses, though the subjects claim to some

24 investors that SHIRLEY's medical expenses are paid in cash.

25        22.     Several investors deposited approximately $400,000 into an Umpqua bank account held

26 by STEPHENS. Analysis of that account reveals that STEPHENS is using some of the investor funds

27 for his own purposes, including to pay for travel expenses and groceries. In addition to investor's funds,

28 STEPHENS also received approximately $18,000 from bank accounts held by MILES and SHIRAZI.

EX PARTE APPLICATION FOR TAX INFORMATION

23.     No traceable funds are seen going to LAKSHMANAN.  It is believed he may be receiving money in cash or into an account not in his name because he appears to have no other source of income, he has an outstanding civil judgment against him, and in e-mails obtained from a search warrant, he indicates that he has no American bank accounts in his name.

<u>The Investment Story is Fraudulent</u>

24.     The story that STEPHENS, MILES, SHIRAZI, AND LASHMANAN tell investors is false. On November 25, 2014, agents spoke with Steven Takizawa, Associate General Counsel & Principal, Legal Division, Federal Reserve Bank of San Francisco.  Takizawa said that the Federal Reserve Bank does not provide services to individuals.  Rather, the Federal Reserve Bank acts as a "wholesale bank" and provides services—including wire, check, and ACH—to depository institutions. (A depository institution is a "retail bank" such as Wells Fargo or Bank of America and provides services to individuals.)  The Federal Reserve Bank also regulates holding companies and banks.

25.     Takizawa stated that the Federal Reserve Bank of San Francisco has never been served with any court order related to a probate matter.  Takizawa had never heard of the Federal Reserve Bank being involved in a probate case related to SHIRLEY or any other probate case.  Takizawa was not aware of any proceeding involving a judge named John Dearman.  The Federal Reserve Bank does not work with state judges to disperse funds from private estates.  The Federal Reserve Bank does not get involved with "secret" litigation, the existence of which is not accessible to the public.  Takizawa had never heard of or dealt with MILES, the purported Trustee in SHIRLEY's probate matter.  Takizawa did not know a Richard, the purported forensic accountant dealing with MILES.

26.     On December 1, 2014, FBI SA Janet Palmore spoke to Retired San Francisco Superior Court Judge John Dearman.  Judge Dearman said that he had never presided over a probate matter related to SHIRLEY.  Judge Dearman had never imposed any type of gag order on a probate matter involving SHIRLEY.  Judge Dearman had never presided over a probate matter involving any individual who was heir to a one billion dollar or one trillion dollar estate.

27.     In the previous five years, Judge Dearman had not had any dealing with the Federal Reserve Bank pertaining to a probate matter or any other matter.  Over the previous five years, Judge Dearman had not had any court dealings with individuals by the names of MILES or SHIRAZI, nor did

14

1 | he know MILES or SHIRAZI.

2 |       28.    On March 15, 2015, SA Palmore spoke to Anthony Mandekic, the Chief Executive

3 | Officer and President of Tracinda Corporation, the company solely owned by Kirk Kerkorian.

4 | Kerkorian was a self-made billionaire residing in Los Angeles, California. Mandekic had been

5 | Kerkorian's personal assistant for the previous 45 years and was the executor of Kerkorian's estate.

6 | Mandekic said that no one in the Kerkorian extended family was named SHIRLEY. Furthermore, there

7 | existed no secret probate proceeding regarding an estate associated with any member of the Kerkorian

8 | family.

9 | Involvement of Shirley Molina in the Fraud

10 |       29.    On June 16, 2015, SA Palmore spoke via telephone with a woman who identified herself

11 | as SHIRLEY MOLINA. SHIRLEY said she had a difficult childhood. As she grew up, she made up a

12 | "story" that she had a great father instead of the horrible father that almost beat her to death while her

13 | mother watched. SHIRLEY's pretend father was a wealthy man who was related to the famous Kirk

14 | Kerkorian. SHIRLEY told many people about how her famous father had left her some money and one

15 | day she was going to get it. SHIRLEY admitted to having been convicted of fraud in the past. SHIRLEY

16 | also admitted that she has met the sister of Judge Dearman, but claimed she had never seen or talked to

17 | Judge Dearman. SHIRLEY stated that she was never involved in any pending probate process related to

18 | a billion or trillion dollar estate.

19 |       30.    On September 10, 2015, SA Palmore spoke with retired San Mateo County District

20 | Attorney Investigator Randall Curtis. Curtis stated that he had twice previously investigated and

21 | arrested SHIRLEY for perpetrating investment fraud schemes in the 1990s in short succession. In both

22 | instances, the fraudulent scheme--involving a story of adoption and a large inheritance--was nearly

23 | identical to the story investors are given in the scheme currently under investigation. Records checks and

24 | additional investigation into SHIRLEY's criminal history confirm that SHIRLEY was convicted for

25 | grand theft of property in San Mateo County Superior Court in 1989 and sentenced to four years state

26 | prison and convicted of felony fraud in San Mateo County Superior Court (after pleading no contest) in

27 | 1997 and sentenced to eight years state prison.

28 |       31.    SHIRLEY also told SA Palmore that she did not know STEPHENS or LAKSHMANAN.

15

EX PARTE APPLICATION FOR TAX INFORMATION

1  SHIRLEY knew MILES and his driver, a man of Middle-Eastern descent named "Mike," (believed to be

2  SHIRAZI). SHIRLEY met MILES in Atlanta many years ago through a mutual friend (SHIRLEY's

3  accomplice in her prior fraud) and became friends. MILES has asked SHIRLEY about her famous

4  pretend father, and SHIRLEY has continued to go along with the story.

5        32.      SHIRLEY further stated that she has never been taken to see any doctor by MILES or

6  Mike. SHIRLEY claimed she had only met MILES for lunch and Mike had driven MILES to meet her.

7  MILES had given SHIRLEY flowers, gifts, and a little cash (approximately a "couple of hundred

8  dollars"). SHIRLEY claimed she does not have a bank account. SHIRLEY also denied ever talking to

9  any investor or person on the telephone to discuss her medical treatments or any matter related to an

10 investment opportunity or to thank anyone for taking care of her.

11       33.      There is reasonable cause to believe that SHIRLEY, despite her denials, is involved in

12 this scheme. Agents have spoken to Lisa Cooper, the former sister-in-law of SHIRLEY's ex-husband's

13 brother. (Cooper's sister was married to Rafael Molina, and Rafael is the brother of SHIRLEY's ex-

14 husband Oscar Molina.) Cooper was asked about money that was deposited into her bank account from

15 MILES. Initially, she stated that Rafael asked to deposit money into her account and would ask her to

16 take it back out and give it to him. She denied it was related to any scheme related to SHIRLEY.

17 Cooper subsequently admitted that she allowed Rafael to use her account and that he told her the money

18 was from MILES and was for SHIRLEY. Cooper stated that she believed SHIRLEY was worth billions

19 of dollars and that SHIRLEY's ex-husband Oscar (Rafael's brother) was also an heir to the estate and

20 that Oscar would share the estate with his family. When agents first spoke to Rafael, he told them that

21 he arranged to have Cooper's account used to receive money for his brother Oscar, SHIRLEY's ex-

22 husband. He indicated he would then return the money to his brother. He denied knowing either MILES

23 or SHIRLEY. Rafael subsequently told agents that MILES deposited money into Cooper's account and

24 that RAFAEL would then provide those funds directly to SHIRLEY. As such, it appears that MILES

25 funneled money to SHIRLEY through Lisa Cooper and her former brother-in-law Rafael.

26       34.      In addition, on September 16, 2015, IRS-CI SA Richards spoke with another investor in

27 the scheme named Stuart Kent. Kent told IRS-CI SA Richards that MILES told Kent that MILES takes

28 cash to SHIRLEY on a regular basis.

16

EX PARTE APPLICATION FOR TAX INFORMATION

1

## Conclusion

2    35.    Based on the foregoing, I believe there is at least reasonable cause to believe that the

3  SUBJECTS have committed wire fraud in the Northern District of California, that the tax return and

4  return information being sought herein is or may be relevant to the commission of such offenses, and

5  that the information cannot reasonably be obtained, under the circumstances, from another source.

6  DATED:

7

8

MATTHEW ACCARDO
Special Agent
Federal Bureau of Investigation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

SEALED BY ORDER
OF THE COURT



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CR 15-90921 MISC PSG

IN RE:

DISCLOSURE OF TAXPAYER RETURNS
AND RETURN INFORMATION

[PROPOSED] ORDER FOR DISCLOSURE OF
TAX RETURN AND RETURN INFORMATION
AND ORDER TO SEAL

(UNDER SEAL)

Having considered the motion of the United States for disclosure of returns, return information, and other information, this Court finds as follows:

(i)      There is reasonable cause to believe, based upon such information believed to be reliable, that a specific criminal act has been committed,

(ii)     There is reasonable cause to believe that the returns, return information, and other information concerning:

1.   LAURENCE MILES

2.   THE MILES TRUST or LAURENCE MILES TRUST

3.   ROBERT STEPHENS

4.   MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI)

5.   RAYAN LAKSHMANAN

6.   SHIRLEY MOLINA (a.k.a. SHIRLEY JACKSON, a.k.a.
     SHIRLEY KERKORIAN, a.k.a. SHIRLEY GREGORIAN, a.k.a.
     SHIRLEY JOCOBO)

are or may be relevant to a matter relating to the commission of such act, and

(iii)    The returns, return information, and other information are sought

ORDER FOR TAX RETURN INFORMATION
CR 15-00034 EJD

1      exclusively for use in a Federal criminal investigation or proceeding concerning such act,
and the information sought to be disclosed cannot reasonably be obtained, under the
circumstances, from another source.

2

3      ACCORDINGLY, IT IS HEREBY ORDERED, pursuant to 26 U.S.C. § 6103(i)(1)(A)(ii) and

4 (iii); and 4(A)(i), that the returns and return information (as those terms are defined in 26 U.S.C. §

5 6103(b)), and other information, including, but not limited to, any tax or information returns including

6 supporting schedules, attachments, or lists; any documents identifying the nature, source, or amount of

7 the taxpayer's income, receipts, assets, and liabilities, including CMIRs and Forms 8300; documents

8 related to any examination, investigation or processing of the taxpayer's return; any documents reflecting

9 a determination of liability of any person or any background file documents relating to such written

10 determination; any documents collected or voluntarily provided to the IRS from sources other than the

11 taxpayer; and certificates of non-filing if returns or return information have not been filed, for the years

12 2009-2015 concerning:

13

14          1.     LAURENCE MILES

15          2.     THE MILES TRUST or LAURENCE MILES TRUST

16          3.     ROBERT STEPHENS

17

18          4.     MUNSIF SHIRAZI (a.k.a. MIKE SHIRAZI)

19          5.     RAYAN LAKSHMANAN

20

21          6.     SHIRLEY MOLINA (a.k.a. SHIRLEY JACKSON, a.k.a.
SHIRLEY KERKORIAN, a.k.a. SHIRLEY GREGORIAN, a.k.a.
SHIRLEY JOCOBO)

22

23 shall be disclosed to the United States Attorney, Assistant United States Attorney Amber S. Rosen, and

24 any other persons only in accordance with the provisions of 26 U.S.C. § 6103 and 26 C.F.R. §

25 301.6103(i)-1.  It is further

26      ORDERED that this Order and the Government's application and declaration in support of the

27 application shall remain sealed until further Order of this Court, except that copies of

28 \\

ORDER FOR TAX RETURN INFORMATION
CR 15-00034 EJD

1  this Order may be served upon the Internal Revenue Service.

2  DATED: 10·21·15

3                              PAUL S. GREWAL
                              UNITED STATES MAGISTRATE JUDGE
4                              NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER FOR TAX RETURN INFORMATION
CR 15-00034 EJD